IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs September 7, 2016

**STATE OF TENNESSEE v. GERALD LAMONT BYARS**

**Appeal from the Circuit Court for Madison County**
**No. 15-211    Roy B. Morgan, Jr., Judge**

———————————

**No. W2016-00005-CCA-R3-CD  -  Filed February 27, 2017**

———————————

Following a jury trial, the Defendant, Gerald Lamont Byars, was convicted of attempted possession of 0.5 grams or more of cocaine with intent to sell, attempted possession of 0.5 grams or more of cocaine with intent to deliver, simple possession of marijuana, and possession of drug paraphernalia. The jury also found that the two attempted cocaine possession offenses constituted criminal gang offenses, and the Defendant received enhanced punishment—a sixteen-year sentence, with the attempted cocaine possession counts and the gang enhancement counts all being merged into a single conviction. He now appeals as of right, arguing (1) that the evidence was insufficient to support his attempted cocaine possession convictions and the gang enhancement violations; (2) that the trial court erred by qualifying a Haywood County Sheriff's Officer as an expert in gang activity; (3) that the gang enhancement statute, Tennessee Code Annotated section 40-35-121, is unconstitutional, entitling him to plain error relief; and (4) that his sixteen-year sentence is excessive. Following our review of the record, we ascertain no error in the guilt phase of the trial on the underlying attempted cocaine possession offenses in Counts 1 and 2. However, because the criminal gang enhancement statute as employed by the State in the guilt phase of the trial on Counts 5 and 6 violates the Due Process Clause of the Fourteenth Amendment and is facially unconstitutional, plain error requires us to reverse the judgments of the trial court in Counts 1, 2, 5, and 6, vacate and dismiss the criminal gang enhancements in Counts 5 and 6, and remand for modification of the judgments in Counts 1 and 2 and a new sentencing hearing on those counts. Because the Defendant does not challenge his misdemeanor convictions or sentences in Counts 3 and 4, those judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part, Modified in Part, Reversed in Part, and Remanded**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT W. WEDEMEYER, JJ., joined.

George Morton Googe, District Public Defender; and Jeremy B. Epperson, Assistant District Public Defender, for the appellant, Gerald Lamont Byars.

Herbert H. Slatery III, Attorney General and Reporter; Jeffrey D. Zentner, Assistant Attorney General; James G. (Jerry) Woodall, District Attorney General; and Jody S. Pickens, Assistant District Attorney General, for the appellee, State of Tennessee.


**OPINION**

FACTUAL BACKGROUND

This case arises from undercover surveillance of a residence at 109 Newton Street in Jackson and the ultimate search of that residence on July 10, 2014. On April 27, 2015, the Madison County Grand Jury returned a six count-indictment against the Defendant, charging him with alternative counts of possession of 0.5 grams or more of cocaine with intent to sell or deliver (Counts 1 and 2), a Class B felony; possession of marijuana (Count 3), a Class A misdemeanor; possession of drug paraphernalia (Count 4), a Class A misdemeanor; and two counts (Counts 5 and 6) of violation of the criminal gang enhancement statute predicated on the underlying offenses in Counts 1 and 2, elevating those offenses one conviction class. See Tenn. Code Ann. §§ 39-17-417, -418, -425(a)(1) & 40-35-121(b). The Defendant proceeded to a trial by jury, where the following facts were adduced during a bifurcated proceeding.

*1. Guilt Phase*. Investigator Tikal Greer with the Jackson Police Department testified that he had been conducting surveillance at the 109 Newton Street address for several days prior to July 10, 2014. During that time, Inv. Greer observed the Defendant's comings and goings from that residence. Inv. Greer also determined that the home's utilities were registered in the Defendant's name. Ultimately, based upon certain observations, a search warrant was issued for the residence, and on July 10, 2014, at 8:00 a.m., officers executed that search warrant. Because no one answered the door, the officers forced their way inside by ramming the door off the hinges. According to Inv. Greer, it was then determined that the residence was unoccupied.

Upon searching the residence, officers found four individually wrapped bags of cocaine and a small bag of marijuana on top of a kitchen cabinet. According to Inv. Greer, the Defendant's "kitchen cabinet was pretty close to the ceiling, so they had to stand on top of the actual cabinet to get to it." Inv. Greer stated that testing later revealed

that the bag of marijuana contained 0.6 grams and that the four bags of cocaine amounted to 16.6 grams of "powder cocaine[.]"[1]

Inv. Greer testified that a digital scale and "a mixing tool" were found in the kitchen drawer immediately below the drugs, and the scale had a white powdery substance on it that field-tested positive for cocaine. Inv. Greer also observed a one dollar bill in the drawer and that bill had "cocaine residue inside of it." Inside the cabinet directly below that drawer, officers retrieved two Pyrex measuring cups, which also field-tested positive for cocaine. Additionally, plastic baggies were discovered "right beside" the microwave on the kitchen counter. Inv. Greer explained that drug users "will normally" put cocaine inside a Pyrex measuring cup "mix[ing] it with baking soda to make crack" or "mixing it with other enhancements to actually cut it just to make more cocaine." He stated that drug traffickers might also use the Pyrex cup to "actually put the cocaine in it and pour it on a digital scale to weigh it" during the resale process. Moreover, a digital scale was "used for weighing purposes" when packaging narcotics, according to Inv. Greer. Inv. Greer detailed the process of making "crack cocaine" for the jury.

Based upon Inv. Greer's "training and experience," all of these items found together indicated a "resale" operation. According to Inv. Greer, the "street value" of 16.6 grams of powder cocaine was approximately $1600, and if that amount was converted into crack cocaine, it had "six times" that value. However, the "small amount" of marijuana was "consistent with personal use[,]" in Inv. Greer's opinion.

Mail was located throughout the residence with the Defendant's name on it—one letter showed a recent postmark of June 5, 2014. Two medicine bottles that had the Defendant's name on them were found alongside the digital scale, mixing tool, and dollar bill in the kitchen drawer. Also, a belt with the Defendant's last name on it was found in the master bedroom, and officers located a checkbook reflecting the Defendant as the account holder. Two additional one-dollar bills with cocaine residue were found in other locations inside the home. The Defendant's work ledger was discovered in the master bedroom and showed his work schedule at Owens Corning Fiberglass.

After the search was conducted, the Defendant was arrested at Owens Corning. The Defendant was in possession of approximately $783 at the time of his arrest.

While incarcerated in the county jail, the Defendant placed a phone call to his mother. During that call, the Defendant said, "It was time to stop, anyway." A recording of the call was played for the jury. The Defendant placed a second call to a female that was also recorded. During this conversation, the Defendant stated to the female that

---

[1]  A Tennessee Bureau of Investigation ("TBI") forensic scientist subsequently testified that the weight of the drugs without the packaging was 15.84 grams of cocaine and 0.45 grams of marijuana.

"they took all [of his] money" he had "just got" but that he was still in possession of the "money where [he] got paid yesterday."

On cross-examination, Inv. Greer acknowledged that several of the items were normal household items found in a kitchen. He also agreed that drug users, as well as sellers, often owned digital scales to weigh their drugs. Furthermore, Inv. Greer confirmed that the presence of the three one-dollar bills in the home indicated personal cocaine usage.

That concluded the State's proof, and the Defendant presented testimony from Monica Turner in his defense. Ms. Turner testified that she lived with the Defendant at the 109 Newton Street address on July 10, 2014, when the search was conducted. She claimed that one of the one-dollar bills found in the bathroom of the home belonged to her and that she and the Defendant used the bill when they did cocaine. Ms. Turner asserted that she had no knowledge of the drugs found inside the residence.

On cross-examination, Ms. Turner stated that she obtained the drugs from "[d]ifferent places." She also estimated that, in July 2014, she made approximately $9.75 per hour at her job and that the Defendant made $11.00 per hour at Owens Corning. She testified regarding the household expenses and agreed that neither she nor the Defendant would have sufficient funds to purchase $1600 worth of cocaine, the amount found inside the home. Ms. Turner averred that, if that amount of cocaine was found in the residence, she had "no idea" how it got there and that it must have belonged to the Defendant. She also stated that any digital scales with cocaine residue on them, as well as any Pyrex measuring cups, were the Defendant's and not hers. She claimed that, if she ever brought cocaine into the house, she usually "finished it up[.]"

Thereafter, the jury convicted the Defendant of the lesser-included offense of attempted possession of 0.5 grams or more of cocaine with intent to sell in Count 1; of the lesser-included offense of attempted possession of 0.5 grams or more of cocaine with intent to deliver in Count 2; as charged, of simple possession of marijuana in Count 3; and as charged, of possession of drug paraphernalia in Count 4.

*2. Gang Enhancement Phase.* At the outset of this second phase, the trial court conducted a jury-out hearing because the Defendant objected to Sergeant Shawn Williams's testifying as an expert in street gangs. Sgt. Williams, with the Haywood County Sheriff's Office ("HCSO"), was called to the stand and began by recounting his employment history. Sgt. Williams stated that he was first hired by the Brownsville Police Department ("BPD") in February 1989 and worked for that agency for approximately twenty-two and one-half years. During his time with the BPD, he received training pertaining to gangs and narcotics law enforcement. He was also involved in federal and state investigations, including the "OCDETF task force" from 1998 to 2005, a task force that was sponsored by the Federal Bureau of Investigation and

4

"targeted the Black Gangster Disciple Nation street gang in Haywood County." Sgt. Williams stated that he had led and participated in "hundreds" of drug and gang investigations "throughout [his] career" and that those investigations often involved the execution of search warrants and use of confidential informants or "cooperating sources." According to Sgt. Williams, he first began investigating the Gangster Disciples when he "was named the first gang investigator" for the BPD in October 1994. Sgt. Williams confirmed that he retired from the BPD in August 2011, and then went to work for the Mason City Police Department as a gang investigator for approximately six months before taking his present job with the HCSO as "a patrol officer, a narcotics investigator and gang investigator[.]" He agreed that his "primary focus in law enforcement ha[d] been the investigation of street gangs."

Regarding his résumé as a gang expert, Sgt. Williams detailed his extensive training and certifications, his memberships in professional organizations, the offices he had held in several gang investigators associations, and the occasions on which he had provided group instruction on the topic. Sgt. Williams said that he had testified four times in court "concerning the presence of street gangs" and also four times about "someone's membership in a street gang[.]" According to Sgt. Williams, during his "law enforcement experience and training," he had become familiar with "the organizational structure of street gangs," "their style of dress," "their symbols that they use," and their "tattoos." Sgt. Williams estimated that, since 1994, seventy-five to eighty-five percent of his work had dealt "with the investigation of, identification of, [and] the prosecution of street gang members[.]"

On cross-examination, the defense asked Sgt. Williams why he retired from the BPD. Sgt. Williams replied that he retired "because, number one, [he] was tired of the politics, and number two, [he] was tired of being accused of and investigated for things [he] didn't do." Sgt. Williams confirmed that he had been investigated for "improper disposal of sensitive items which were in evidence[.]" While there was never any finding of criminal wrongdoing, according to Sgt. Williams, he was informed that the TBI found that "several policies and procedures of the police department" had been violated. He asserted that he was not told any specifics about what policies and procedures he had violated due to his decision to voluntarily retire. Sgt. Williams also agreed that he had received a written reprimand in September 2014 for "[i]nappropriate communication with dispatch" based upon his use of "unprofessional language"; however, no further action was taken, according to Sgt. Williams.

The trial court concluded that the defense could not ask Sgt. Williams about these disciplinary incidents as impeachment evidence or as a method of attacking Sgt. Williams's qualifications. The trial court reasoned as follows:

> First of all, this inappropriate communication, I guess using inappropriate words or responding back to dispatch, would certainly not go

5

to credibility, truthfulness issue and I don't think has anything to do with his qualifications as an expert . . . .

Now as far as the other matter, dealing with the TBI investigation, I'm looking at the press release. . . . It doesn't say what the BPD policies and procedures were, it just says they've been addressed. It clearly says TBI didn't find [Sgt. Williams] violated criminal laws, and it said they just uncovered several policy and procedures had been—had not been followed. It doesn't talk about willfulness, intentional. It clearly rules out criminal.

. . . .

The court is of the opinion that . . . it's not for impeachment purposes, wouldn't be proper consideration. It really doesn't go to his scientific, technical or otherwise specialized knowledge and training in this area. I don't—with the lack of any further information, I don't find it would be proper.

. . . .

I'm not going to allow it at this point due to the vagueness of the whole situation. It's just not specific. It would be very misleading I think to the trier of fact.

Sgt. Williams then gave testimony about how his expertise specifically pertained to the Defendant's case. Thereafter, the trial court determined that Sgt. Williams had specialized knowledge on street gangs, that his qualifications were sufficient to declare him an expert in the area of gang activities, and that his testimony would substantially assist the jury. That concluded the hearing out of the jury's presence.

Inv. Tikal Greer was recalled before the jury and identified some photographs he had taken at the Defendant's residence. He testified that he photographed a different belt that had been found on the bedroom dresser across from the aforementioned belt with the Defendant's last name on it. This second belt was blue and white and had "DUES PAID" printed on the belt strap and "BLAC" on the belt buckle. Inv. Greer stated that he photographed this belt believing it to be "gang paraphernalia dealing with the Gangster Disciples."

Inv. Greer also observed the Defendant's tattoo on his right shoulder, which he described as "a heart with wings on it, pitchfork, a crown" and had the initials "BOD" or "BOS" above it. According to Inv. Greer, the tattoo was "associated with the Gangster Disciples." On cross-examination, Inv. Greer acknowledged that the tattoo "appeared old."

Samuel Gilley testified that he had worked for the Jackson Police Department almost eleven years, serving as a patrolman for four years, then on the "street crimes unit" approximately one year, and then on "[t]he gang enforcement team" for six years. He currently worked for Madison County Metro Narcotics, holding that position for only a few months. Ofc. Gilley testified that he had received training in and had experience dealing with street gangs. He also detailed his extensive knowledge, education, and experience on the subject.

Ofc. Gilley confirmed that he was familiar with a street gang called the "Gangster Disciples." The Gangster Disciples was a national gang originating in Chicago, and Ofc. Gilley had been investigating the local chapter of this gang since 2010. Ofc. Gilley described the gang's organizational structure as similar to a "pyramid scheme" with the "people at the very top" making the most money. According to Ofc. Gilley, the "predominant function" of the Gangster Disciples had always been "narcotics trafficking," cocaine specifically, and "having membership to this organization essentially is sending money back to the organization, the chairman." In addition, Ofc. Gilley said that Gangster Disciples engaged in other illegal activities associated with drug sales:

> [Y]ou're going to have beefs over territories to sell those drugs, you're going to have shootings and homicides that come along with that. You're going to have everything from robbery—You know, they're not going to accept someone trying to sell drugs in their territory, so the first thing they're going to do is rob them, take everything they have, tell them to get out of there, you know, that's their turf.

Ofc. Gilley confirmed that the Gangster Disciples was the "most organized gang" in Jackson and Haywood County, with a significant membership. There was a "close association" between Gangster Disciples members in Jackson and Haywood County, according to Ofc. Gilley. Ofc. Gilley was also familiar with specific individuals in these areas, identifying Terrell Lamont Reed, Byron Purdy, William Arnold, Tommy Champion, Michael Anthony Smith, and Marvin Sangster, whom Ofc. Gilley described as "documented members" of the Gangster Disciples. Ofc. Gilley explained that documented membership was based upon a ten-point scale system, where points are awarded for certain behaviors. Each behavior or factor was given a point value, and if an individual achieved ten points on the check list, then he or she was considered a gang member. For example, according to Ofc. Gilley, Terrell Reed admitted to being a gang member, which gave him nine points; Reed affiliated with other gang members, which gave him "another couple of points"; and Reed had gang-related tattoos again giving him "another couple of points," placing Reed close to twenty points on a scale of ten.

Ofc. Gilley said that Reed was convicted on June 24, 2015, of possession of cocaine with intent to sell and possession of a firearm by a convicted felon, and Reed

7

pled guilty to gang enhancement at that time, specifically being a member of the Gangster Disciples. Reed was also convicted of aggravated assault on August 26, 2011, and sale of cocaine on May 2, 2007. According to Ofc. Gilley, Reed was "chief of security for the governor of the State of Tennessee," who was Purdy, and Purdy resided in Jackson. The other individuals identified by Ofc. Gilley were also in "that higher echelon" of Gangster Disciples membership.

Ofc. Gilley identified Michael Smith as "an associate" who, when not imprisoned, had "served as enforcer and also chief security for the governor of the entire state." Ofc. Gilley described the duties of these positions: the enforcer does "whatever muscle work needs to be done as far as shootings, assaults, anything like that"; and the chief of security "keep[s] up with all the firearms for the gangs, make[s] sure that they know the status the gang is on or if they're in a heat with someone, to make sure the right people are armed." Ofc. Gilley further testified that Smith had likewise admitted to being a member of the Gangster Disciples, that Smith had "also done other things on the point of scale to get him well above that [ten] mark[,]" and that Smith had been convicted of possession of marijuana with intent to sell, unlawful possession of a firearm, and assault.

Regarding Tommy Champion, he had also served as enforcer for the Gangster Disciples, had admitted affiliation with the Gangster Disciples, and had "met the requirements of that same [ten]-point scale[,]" according to Ofc. Gilley. Champion had convictions for possession of cocaine with intent to sell or deliver, possession of a firearm during the commission of a dangerous felony, assault, and unlawful possession of a firearm (two counts). Ofc. Gilley said that a firearm was a "common tool" for those involved in the drug trade and the "gang lifestyle[.]"

Ofc. Gilley discussed how gangs use social media:

They use it for several things, to communicate with one another, also they use it as a recruitment tool because, you know, everybody is letting their kids on social media now. Gangster Disciples will actually begin recruiting kids as young as [ten] years old. So it's a good tool for them to use to get the word out.

Ofc. Gilley then identified two videos obtained from Facebook—one "network[ing]" video in which Jeffrey Harris, a local rapper known as "Stack Plenty," performed at the gang's "home base," a Jackson apartment complex; and another "video involving a dispute between the Gangster Disciples and a rapper named Rick Ross[.]" According to Ofc. Gilley, Rick Ross and the Gangster Disciples had "a nationwide beef" over Ross's "using some depictions of some of [the gang's] symbols and the mention of their leader's name in . . . one of his songs without [Ross's] paying what [the gang] observed to be royalties for that back to them." Both videos were played for the jury. In the videos,

8

several of the aforementioned documented members are discernible, and participants can be seen wearing gang paraphernalia, using slogans, and making hand gestures.

Ofc. Gilley next identified two Facebook photographs. The first photograph depicted "A Gangster's Prayer," which was a prayer common among gang members, according to Ofc. Gilley. The second was a photograph of a professional basketball player with the Chicago Bulls and included a statement congratulating the "Brothers of the Struggle," "basically [meaning] life, getting locked up for the things that are illegal that you do and different things like that." Ofc. Gilley said that gang members often referred to each other as "Brothers of the Struggle" or "BOSS" rather than as gangsters. There was also a reference in the photograph to "Growth and Development," which was another name for the Gangster Disciples, according to Ofc. Gilley. The phrase "United in Peace" was also used, which Ofc. Gilley said referred to "an organization that was started by the Gangster Disciples" that "claim[ed] to help stop gang violence." The basketball player can also be seen displaying a known gang sign of the Gangster Disciples—a pitchfork.

On cross-examination, Ofc. Gilley was asked if it was possible to stop affiliating with a gang, to which he responded affirmatively. Ofc. Gilley said that "normally" the Gangster Disciples "will let you out if you have become older, had children and you want to do it for family and/or religious reasons." Ofc. Gilley continued, "With that being said, you will still go to OG status where you're still protected by the gang, but you do not have to participate in the active roles of committing crimes or anything like that." Finally, Ofc. Gilley confirmed that, if a gang member "snitched" on other gang member about their drug activity, it could result in that person "being killed, among other things" because it was viewed as "a pretty serious violation."

Inv. Greer was recalled and verified that the two Facebook photos came from the Defendant's Facebook account. On cross-examination, Inv. Greer confirmed that it was possible for someone to place photographs on another person's Facebook account and also that a Facebook account could be "hacked."

Sgt. Williams was called to testify in front of the jury and, after providing his qualifications, training, and expertise, was permitted to testify as a gang expert. He stated that he was familiar with the Gangster Disciples—a street gang with a presence in forty-two states, including "virtually every county in Tennessee[,]" according to Sgt. Williams. He stated that the principal activity of the Gangster Disciples was "narcotics dealing, specifically cocaine and heroin and marijuana[,]" but that enterprise also involved "violent crimes, first degree murder, second degree murder, aggravated assault, simple assault, rape and various and sundry other crimes, weapons trafficking." Sgt. Williams said that the Gangster Disciples in Haywood and Madison Counties were "virtually interchangeable." During his time investigating gangs in that area, Sgt. Williams became familiar with the Defendant.

Sgt. Williams recalled a conversation he had with the Defendant in April 2013. The Defendant had been arrested, and Sgt. Williams spoke with him at the jail. Sgt. Williams said that the Gangster Disciples controlled the Scott Street neighborhood and that the Defendant had provided an address in that neighborhood. According to Sgt. Williams, the Defendant "claimed credit for the calm that [the police] had seen for several years in Brownsville and Haywood County in those areas controlled by the Gangster Disciples." Sgt. Williams explained:

> For several years we had had incidents where rival gangs and groups in Haywood County and City of Brownsville specifically would shoot at each other and fight each other and that kind of stuff, and we were going through a period at that time of calm where we hadn't had anything for several years, and [the Defendant] claimed credit for the calm in that neighborhood.

This claim by the Defendant indicated to Sgt. Williams that the Defendant held a position of "some rank in the Gangster Disciples." Moreover, the Defendant had admitted gang membership in an interview conducted by Sgt. Williams several years earlier.

According to Sgt. Williams, in the gang culture, tattoos were "how gang members let other gang members and other people that are not gang members know that they are gang members, what gang they belong to, and they try to reflect respect between each other and exhibit fear towards the general community[.]" Sgt. Williams testified that he had observed the Defendant's tattoo. The Defendant had a tattoo identified as "the gangster crest"—a heart with the letter "G" in the middle; on top of the heart was a three-point crown; and on top of the crown were pitchforks and "the numbers 7-4[,]" signifying "the letters 'G' and 'D' below it."

Sgt. Williams was then shown the photograph of the blue and white belt found on the Defendant's bedroom dresser. He was asked about the significance of the word "BLAC" on the belt buckle. According to Sgt. Williams, the Gangster Disciples never used the letters "C" and "K" together, and the Defendant was known "on the street" as "both Hog and Crunchy Blac." Also, the term "DUES PAID" that was printed on the belt strap, Sgt. Williams explained, was "a prison term used by the Gangster Disciples to show that a member, when he wears the belt, he has paid his dues for the month, and it . . . indicates work that he's put in on the street from the street gang."

The Defendant resided in and frequented areas in Brownsville controlled by the Gangster Disciples, according to Sgt. Williams. Sgt. Williams also said that he had seen the Defendant frequently in the company of several documented Gangster Disciples members: Marvin Sangster, Randy Lanier, Randy Holloway, Jr., Melvin Taylor, Damont Shaw, and Tracy Taylor.

On cross-examination, Sgt. Williams agreed that the types of crimes he cited were not exclusive to street gangs. He also confirmed that the Defendant's admission to gang membership and the "majority of [his] observations" regarding the Defendant with other gang members occurred over ten years ago. Sgt. Williams stated that an individual was allowed to withdraw or "retire" to shield their children from the gang lifestyle or when reaching a certain age. However, retirement meant:

> [Y]ou don't have to participate in gang activities anymore, but as long as you pay your dues, the gang will always be there to protect and they'll always be there to help you, and if something kicks off, some war kicks off with a rival gang, they do expect you to come back and participate.

Sgt. Williams said on redirect examination that most retired gang members did not hang onto gang paraphernalia, wear gang colors or belts, and were no longer involved in criminal activity. Because the Defendant was in possession of both cocaine and the belt, Sgt. Williams believed he was an active participant in the Gangster Disciples. Moreover, Sgt. Williams said that no one was ever "really out" of a street gang.

The forty-year-old Defendant testified that he did have contact with Sgt. Williams several years prior, but he did not recall confessing to Sgt. Williams that he was a member of the Gangster Disciples. The Defendant admitted that he was involved in the Gangster Disciples but stated that his involvement with the gang ended before the birth of his son, who was eighteen years old. He claimed that his gang tattoo was also "older than [his] son."

The Defendant said he did not know Terrell Reed, Tommy Champion, Michael Smith, Byron Purdy, or Jeffrey Harris. He did acknowledge that he knew Marvin Sangster but asserted that he had not seen Sangster in ten or fifteen years. The Defendant also denied having been in the Gangster Disciples' "compound around Guardian Courts" Apartments in Jackson. According to the Defendant, he had four kids and was about to be a grandfather, and therefore, he was no longer an active member of the Gangster Disciples, giving "up that lifestyle" for his family. The Defendant claimed that he "just stopped" associating with the gang. Finally, the Defendant said he was not involved with the videos shown to the jury and disagreed with "the behavior" displayed therein.

On cross-examination, the Defendant stated that he bought the sixteen grams of powder cocaine found inside his apartment from "[s]omebody off the street[,]" although he could not provide a name. He asserted that he often bought cocaine at the "Dollar Store on Royal." He disputed that the amount of cocaine in his apartment was worth $1600, claiming that he only paid $450 for it. Regarding the digital scales found inside his home, the Defendant professed that he used them to weigh his own cocaine to prevent being cheated. He maintained that he did not "cook cocaine" and could not offer a plausible explanation for why cocaine was found on the Pyrex measuring cups.

11

The Defendant insisted that he did not sell drugs when he was a Gangster Disciples, averring that the gang instead "[c]lean[ed] up the neighborhood" by taking out garbage for the elderly, cutting their grass, and other "things of that nature[.]" According to the Defendant, members of the Gangster Disciples participate in a wide array of activities, with only "some" being involved in the sale of narcotics. The Defendant acknowledged that the belt found on his dresser was a "Gangster Disciple belt" and agreed that he went by the nickname of "Hog or Crunchy Blac." According to the Defendant, the belt did not have a "K" after "BLAC" simply because there was not enough room on the buckle; it had nothing to do with gang tenets. He also asserted that the phrase "DUES PAID" on the belt strap referenced an old song and had no gang connotation. According to the Defendant, he "never paid any dues." He claimed that the phrase could also mean "time's up" or that one was through with the gang.

After his arrest in this case, the Defendant asked someone to lie to his employer about why he was arrested—rather than drugs, to claim it was "just some old fine, warrant, anything, something old." Despite this admitted fabrication, which was documented on one of the phone call recordings from jail, the Defendant professed that he was testifying truthfully at trial because he was under oath.

The Defendant could not recall ever taking credit for the "calm in that particular area" during his conversation with Sgt. Williams. He confirmed that the photo of the professional basketball player was from his Facebook account, although he claimed it was sent to him from someone else and that he did not purposely post it to his timeline himself. He had no recollection of the photo regarding "A Gangster's Prayer." Although he had "thrown" gang signs in the past, he asserted that he no longer engaged in that practice. He was able to demonstrate a hand sign for the jury and said that he had displayed a pitchfork before.

After deliberation, the jury found that the gang enhancement statute applied to the Defendant. Specifically, the jury found that the Defendant was guilty of criminal gang offenses as charged in Counts 5 and 6. Further, the jury found that the Defendant was a criminal gang member because (1) the Defendant resided in or frequented a particular criminal gang's area, adopted their style or dress, their use of hand signs or their tattoos, and associated with known criminal gang members; and (2) the Defendant was identified as a criminal gang member by physical evidence such as photographs or other documentation.

*3. Sentencing.* At the sentencing hearing, the trial court enhanced the Defendant's sentence to one classification higher for his attempted cocaine possession convictions in Counts 1 and 2, elevating those both from Class C to Class B felonies, pursuant to subsection (b) of Tennessee Code Annotated section 40-35-121. The trial court found the Defendant to be a Range II, multiple offender for the Class B felony convictions, which placed the Defendant in a sentencing range of twelve to twenty years. See Tenn. Code

12

Ann. § 40-35-112(b)(2). In setting the length of the Defendant's sentences to the midpoint of the range, sixteen years, the trial court considered two enhancement factors: (1) the Defendant's previous history of criminal convictions in addition to those necessary to establish the appropriate range; and (2) the Defendant had previously failed to comply with conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(1) & (8).

The Defendant had two other felony convictions in federal court in addition to the two used to establish his range—a January 6, 2013 conviction for escape, receiving a fifteen-month sentence followed by two years of supervised release (Western District of Tennessee); and a November 13, 2007 conviction for being a felon in possession of a firearm, receiving a seventy-two-month sentence followed by two years of supervised release (Eastern District of Missouri). The State also documented thirteen misdemeanor convictions in Haywood County—reckless driving (convicted on July 12, 2011); driving on a suspended license (convicted on March 12, 1996, October 10, 1995, and December 13, 1994); driving on a revoked license "with priors" (convicted on November 14, 1996); disorderly conduct (convicted on October 10, 1995); evading arrest (convicted on November 14, 1996, October 24, 1995, and October 10, 1995); assault (convicted on June 21, 1994, and May 31, 1994); disobeying a stop sign (convicted on November 14, 1996); and "threatening a police official" (convicted on December 13, 1994). Additionally, the Defendant was convicted of possession with intent to distribute cocaine on November 14, 1996, in Haywood County and received a six-year suspended sentence. He was serving this suspended sentence when, in federal court (Western District of Tennessee), he was convicted on May 11, 1999, of possession with intent to distribute cocaine and received a twenty-seven-month sentence followed by two years of supervised release.[2] According to the presentence report, the Defendant's six-year sentence in Haywood County was "revoked to serve" on March 1, 1999, after he was declared an absconder, which was his second violation of that community corrections sentence.

Inv. Greer also testified at the sentencing hearing. Inv. Greer confirmed that, while this case was pending, the Defendant provided information to the authorities which led to the discovery of narcotics on two occasions—on one occasion, officers recovered a gun, 90.3 grams of powder cocaine, and 12.5 grams of crack cocaine, and several vehicles and cash were seized; and on a separate occasion, an additional 6 grams of powder cocaine, drug paraphernalia, and "some items from that residence" were seized. According to Inv. Greer, both individuals involved with the narcotics seizures were members of the Gangster Disciples. Inv. Greer agreed that the Defendant "exposed himself" to harm by "snitching on" these other members, possibly "end[ing] up dead." On cross-examination, Inv. Greer said that, because the Defendant had knowledge of two people associated with the Gangster Disciples in possession of cocaine, the Defendant was likely still associated with that gang and involved in the "drug trade" himself.

---

[2] The Defendant disputed that the federal offense occurred while he was on state probation.

13

The Defendant testified that he was concerned for his own welfare if sent to jail. According to the Defendant, the gang was already aware that he had informed on other members. The Defendant averred that he talked with Inv. Greer in hopes of staying with his family and not going to jail.

The Defendant argued for two mitigating factors: (1) the Defendant's criminal conduct neither caused nor threatened serious bodily injury; and (2) the Defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses. See Tenn. Code Ann. § 40-35-133(1) & (9). The trial court found that only one mitigating factor applied, that the Defendant's criminal conduct neither caused nor threatened serious bodily injury, and did not give any credit to the Defendant for his cooperation with the authorities.

The trial court then merged Counts 1 and 2 and imposed a sentence of sixteen years as a Range II, multiple offender for the Class B felony cocaine convictions. The trial court further sentenced the Defendant to eleven months and twenty-nine days each for the simple possession of marijuana and possession of drug paraphernalia convictions (Counts 3 and 4); those sentences to be served concurrently with one another and with the sixteen-year sentence. After the trial court denied his motion for new trial, the Defendant filed a timely notice of appeal.[3]

ANALYSIS

*I. Guilt Phase*

On appeal, with regard to the guilt phase, the Defendant challenges the sufficiency of the evidence supporting his convictions for attempted possession of 0.5 grams or more of cocaine with intent to sell or deliver in Counts 1 and 2. Although he does not contest that he possessed cocaine, he contends it was for his personal use, noting the presence of one-dollar bills in the residence, Inv. Greer's testimony that digital scales are used by drug users as well as sellers, and Ms. Turner's testimony that the Defendant used cocaine. The State responds that any discrepancies in the proof are within the province of the jury, and the Defendant, therefore, cannot prevail in his challenge to the sufficiency of the evidence in this regard.

An appellate court's standard of review when a defendant questions the sufficiency of the evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979). This court does not reweigh the evidence; rather, it presumes that the jury has resolved all conflicts in the testimony and drawn all reasonable inferences from the

___

[3] A transcript of the motion for new trial hearing is not included in the appellate record.

14

evidence in favor of the State.  See State v. Sheffield, 676 S.W.2d 542, 547 (Tenn. 1984); State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978).  Questions regarding witness credibility, conflicts in testimony, and the weight and value to be given to evidence were resolved by the jury.  See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997).

A guilty verdict "removes the presumption of innocence and replaces it with a presumption of guilt, and [on appeal] the defendant has the burden of illustrating why the evidence is insufficient to support the jury's verdict."  Id.; State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  "This [standard] applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of [both] direct and circumstantial evidence."  State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  The standard of proof is the same, whether the evidence is direct or circumstantial.  State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).  Likewise, appellate review of the convicting evidence "is the same whether the conviction is based upon direct or circumstantial evidence."  Id. (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).  The duty of this court "on appeal of a conviction is not to contemplate all plausible inferences in the [d]efendant's favor, but to draw all reasonable inferences from the evidence in favor of the State."  State v. Sisk, 343 S.W.3d 60, 67 (Tenn. 2011).

The jury found the Defendant guilty in Count 1 of attempted possession of 0.5 grams or more of cocaine with intent to sell and in Count 2 of attempted possession of 0.5 grams or more of cocaine with intent to deliver, Class C felonies.  As alternate theories of the same offense, the trial court merged the two convictions.

Our criminal statutes provide that it is an offense to knowingly possess a controlled substance with the intent to sell or deliver the controlled substance.  Tenn. Code Ann. § 39-17-417(a)(4).  The Code further classifies cocaine as a Schedule II controlled substance.  Tenn. Code Ann. § 39-17-408(b)(4).  As relevant here, a person commits criminal attempt who, acting with the kind of culpability otherwise required for the offense, "[a]cts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense."  Tenn. Code Ann. § 39-12-101(a)(3).  A violation of Tennessee Code Annotated Section 39-17-417(a)(4) is a Class B felony if the amount of the cocaine possessed is more than 0.5 grams.  Tenn. Code Ann. § 39-17-417(c)(1).  A conviction for criminal attempt of an offense results in one classification lower than the most serious crime attempted, in this case, making the Defendant's convictions Class C felonies.  Tenn. Code Ann. § 39-12-107(a).[4]

We conclude that the evidence was sufficient for a reasonable juror to find the Defendant guilty of attempted cocaine possession with intent to sell or deliver.  The proof regarding intent in this case, as in most cases, was largely circumstantial.  However, in

[4] Later elevated to Class B felonies based upon the gang enhancement violations.

15

light of Inv. Greer's testimony and the amount of cocaine that was found, the jury could reasonably infer that the drugs were for resale. See Tenn. Code Ann. § 39-17-419 ("It may be inferred from the amount of a controlled substance or substances possessed by an offender, along with other relevant facts surrounding the arrest, that the controlled substance or substances were possessed with the purpose of selling or otherwise dispensing."). Such "other relevant facts" that can give rise to an inference of intent to sell or deliver include the absence of drug paraphernalia, the presence of a large amount of cash, the packaging of the drugs, and the street value of the drugs. See State v. Belew, 348 S.W.3d 186, 191-92 (Tenn. Crim. App. 2005) (citing State v. Chearis, 995 S.W.2d 641, 645 (Tenn. Crim. App. 1999) (finding sufficient evidence to support the jury's verdict of intent to deliver when the defendant possessed 1.7 grams of crack cocaine, no drug paraphernalia, and 5.1 grams of baking soda); State v. Logan, 973 S.W.2d 279, 281 (Tenn. Crim. App. 1998) (finding sufficient evidence of intent to sell in support of conviction when the defendant possessed a large amount of cash and several small bags of cocaine); State v. Brown, 915 S.W.2d 3, 8 (Tenn. Crim. App. 1995) (finding that the absence of drug paraphernalia and the manner of packaging of drugs supported an inference of intent to sell); State v. Matthews, 805 S.W.2d 776, 782 (Tenn. Crim. App. 1990) (finding that testimony concerning amount and street value of drugs was admissible to prove the defendant's intent); State v. Charles Benson, No. M2003-02127-CCA-R3-CD, 2004 WL 2266801, at *8 (Tenn. Crim. App. Oct. 8, 2004) (finding that the absence of drug paraphernalia and testimony of value and amount of 3.3 grams of cocaine sufficient for the jury to infer the defendant's intent to sell and deliver it); State v. William Martin Frey, No. M2003-01996-CCA-R3-CD, 2004 WL 2266799, at *8 (Tenn. Crim. App. Oct. 6, 2004) (finding that testimony of 1.8 grams of cocaine, a "stack" of cash, and absence of drug paraphernalia constituted sufficient evidence to support the jury's inference of intent to sell)).

Here, Inv. Greer found sixteen grams of powder cocaine inside the Defendant's residence, which he testified had a street value of approximately $1600. This cocaine was packaged into four small bags. Plastic baggies were found in the residence, alongside digital scales and Pyrex measuring cups that field-tested positive for cocaine residue. Inv. Greer described the process of turning powder cocaine into crack cocaine and how these items were used in that process. Based upon Inv. Greer's "training and experience," all of these items found together indicated a "resale" operation. Moreover, according to Inv. Greer, this quantity of cocaine, if converted into crack cocaine, had six times the street value. The Defendant was also in possession of a large sum of cash, $783, upon his arrest; however, he only made $11 per hour at his job. He further claimed in a recorded call from the jail that he had more money in his possession. In another call to his mother, the Defendant stated, "It was time to stop, anyway." While some drug paraphernalia was found inside the home, and Ms. Turner stated that she and the Defendant both used cocaine, the jury was free to disregard the Defendant's assertion that the cocaine was solely for his personal use. See, e.g., State v. Xavier Kenta Lewis, No. M2005-02062-CCA-R3-CD, 2006 WL 2380614, at *8 (Tenn. Crim. App. Aug 16, 2006)

("[T]he jury obviously chose not to accredit the defendant's testimony that he had bought the cocaine for his own personal use."). The facts, taken together, were more than sufficient to allow a jury to reach the conclusion that the Defendant attempted to commit the crime of possession of a controlled substance with intent to sell or deliver it. The Defendant is not entitled to relief on this issue.

## *II. Gang Enhancement Phase*

During the second phase of the trial, regarding Counts 5 and 6, the jury found that the underlying attempted cocaine possession offenses were criminal gang offenses pursuant to Tennessee Code Annotated section 40-35-121 and subject to enhanced punishment. Under Tennessee Code Annotated section 40-35-121(b), "[a] criminal gang offense committed by a defendant who was a criminal gang member at the time of the offense shall be punished one (1) classification higher than the classification established by the specific statute creating the offense committed." Tenn. Code Ann. § 40-35-121(b) (2014). As applicable to this case, a "criminal gang offense" is defined as follows: "[t]he commission or attempted commission, facilitation of, solicitation of, or conspiracy to commit [p]ossession of a controlled substance . . . with intent to sell, deliver, or manufacture, as defined in § 39-17-417(a)(4)[.]" Tenn. Code Ann. § 40-35-121(a)(3)(B)(xxv) (2014). Moreover, a

> "[c]riminal gang" means a formal or informal ongoing organization, association or group consisting of three (3) or more persons that has: (A) [a]s one (1) of its activities the commission of criminal acts; and (B) [t]wo (2) or more members who, individually or collectively, engage in or have engaged in a pattern of criminal gang activity.

Tenn. Code Ann. § 40-35-121(a)(1) (2014). The statute describes a "pattern of criminal gang activity" as "prior convictions for the commission or attempted commission of, facilitation of, solicitation of, or conspiracy to commit" the following:

> (i) Two (2) or more criminal gang offenses that are classified as felonies; or
> (ii) Three (3) or more criminal gang offenses that are classified as misdemeanors; or
> (iii) One (1) or more criminal gang offenses that are classified as felonies and two (2) or more criminal gang offenses that are classified as misdemeanors; and
> (iv) The criminal gang offenses are committed on separate occasions; and
> (v) The criminal gang offenses are committed within a five-year period[.]

Tenn. Code Ann. § 40-35-121(a)(4)(A) (2014). Finally, a "criminal gang member" is identified as "a person who is a member of a criminal gang," as defined above, and "who meets two (2) or more of the following criteria":

17

(A) Admits to criminal gang involvement;

(B) Is identified as a criminal gang member by a parent or guardian;

(C) Is identified as a criminal gang member by a documented reliable informant;

(D) Resides in or frequents a particular gang's area, adopts their style or dress, their use of hand signs or their tattoos and associates with known criminal gang members;

(E) Is identified as a criminal gang member by an informant of previously untested reliability and the identification is corroborated by independent information;

(F) Has been arrested more than once in the company of identified criminal gang members for offenses that are consistent with usual criminal gang activity.

(G) Is identified as a criminal gang member by physical evidence such as photographs or other documentation[.]

Tenn. Code Ann. § 40-35-121(a)(2) (2014).

The Defendant raises the following issues with regard to his criminal gang enhancement offenses: (1) the trial court erred in admitting testimony from Sergeant Shawn Williams as a gang expert; (2) the evidence is insufficient to support violations of the gang enhancement statute; and (3) the statute violates the Due Process Clause of the Fourteenth Amendment, entitling him to plain error relief. We will address each issue in turn.

### A. Expert Testimony

The Defendant claims that the trial court erred by allowing Sgt. Williams to testify as an expert in street gangs because Sgt. Williams lacked sufficient qualifications to give such testimony. Furthermore, he submits that "the trial court failed to consider the disciplinary issues of Sgt. Williams with his current and past places of employment when deeming him an expert witness." The State contends that the trial court properly exercised its discretion by allowing Sgt. Williams to testify as an expert in the field of gang activity.

Tennessee Rule of Evidence 702 provides, "If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise." An expert may base his opinion upon facts or data imparted to or perceived by the expert prior to or at a hearing, and the facts or data need not be admissible if they are the type of facts or data reasonably relied upon by experts in the particular field. Tenn. R. Evid. 703. The trial court shall disallow testimony in the form of an opinion if the underlying

18

facts or data indicate a lack of trustworthiness.  Id.  Moreover, expert testimony must be both relevant and reliable before it may be admitted.  McDaniel v. CSX Transp., 955 S.W.2d 257, 265 (Tenn. 1997).  "Questions regarding the qualifications, admissibility, relevancy, and competency of expert testimony are matters left within the broad discretion of the trial court."  State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). This court will not overturn the trial court's ruling regarding the admissibility of expert testimony absent an abuse of discretion.  Id.

First, it is clear that gang activity is a recognized area of expertise.  See State v. Justin Mathis, No. W2005-02903-CCA-R3-CD, 2007 WL 2120190, at *9 (Tenn. Crim. App. July 20, 2007) (citing United States v. Hankey, 203 F.3d 1160, 1169 (holding that a police officer was qualified to testify as "gang expert"); Jackson v. State, 197 S.W.3d 468, 471 (Ark. 2004) (concluding same); People v. Williams, 753 N.E.2d 1089, 1094 (Ill. App. Ct. 2001) (concluding same); State v. Montea Wilson, No. W2000-00748-CCA-R3-CD, 2002 WL 925255 (Tenn. Crim. App. May 3, 2002) (reflecting that a correctional employee was qualified at trial as an expert on gang affiliation)); see also State v. Bonds, 502 S.W.3d 118, 143-44 (Tenn. Crim. App. 2016), perm. app. denied (Tenn. 2016). Moreover, we disagree with the Defendant's argument that Sgt. Williams was not qualified to testify as an expert on street gangs.  See, e.g., Mathis, 2007 WL 2120190, at *9 (concluding same under similar facts).  Our supreme court has observed that an expert witness "may acquire the necessary expertise through formal education or life experiences."  State v. Reid, 91 S.W.3d 247, 302 (Tenn. 2002). "However, the witness must have such superior skill, experience, training, education, or knowledge within the particular area that his or her degree of expertise is beyond the scope of common knowledge and experience of the average person."  Id.  Sgt. Williams testified that he began investigating the Gangster Disciples in October 1994 when he "was named the first gang investigator" for the BPD.  Moreover, "throughout [his] career," Sgt. Williams had led and participated in "hundreds" of drug and gang investigations, which included the OCDETF task force from 1998 to 2005, a task force that "targeted the Black Gangster Disciple Nation street gang in Haywood County."  Sgt. Williams estimated that, since 1994, seventy-five to eighty-five percent of his work dealt "with the investigation of, identification of, [and] the prosecution of street gang members[.]"

Regarding his expertise with criminal gangs, Sgt. Williams detailed his extensive training and certifications, his memberships in professional organizations, the offices he had held in gang investigators associations, and the occasions on which he provided group instruction on the topic.  Sgt. Williams also had testified in court before "concerning the presence of street gangs" and about "someone's membership in a street gang[.]"  According to Sgt. Williams, he was familiar with "the organizational structure of street gangs," "their style of dress," "their symbols that they use," and their "tattoos." It was clear that Sgt. Williams's "primary focus in law enforcement ha[d] been the investigation of street gangs."

19

The Defendant argues that "the trial court failed to consider" Sgt. Williams's disciplinary issues in deeming him qualified as a gang expert. This assertion is not supported by the record. Here, the trial court found that the instance of improper communication with dispatch did not touch upon Sgt. Williams's scientific, technical, or specialized knowledge or character for truthfulness. The trial court also found that the results of the TBI investigation into Sgt. Williams's violation of BPD's policies and procedures were too vague and speculative to be admitted as impeachment evidence or as evidence impacting his qualifications and credibility as an expert witness. See, e.g., State v. Larkin, 443 S.W.3d 751, 812 (Tenn. Crim. App. 2013) (finding no merit to "the proposition that an expert witness is 'untruthful' when he or she omits from his or her CV a reprimand that is not related to the litigation at issue or that does not, in and of itself, impact the expert's qualifications and/or credibility"). We conclude that the trial court did not abuse its discretion by determining that Sgt. Williams was qualified to testify as a gang expert.

*B. Sufficiency*

The Defendant argues that his gang enhancement convictions under section 40-35-121(b) were not supported by sufficient evidence. Specifically, he contends, "at best, the proof only established his involvement in the Gangster Disciples [twenty] years or more prior to the allegations of this matter, not at the time of the alleged offenses[,]" noting that Sgt. Williams's "observations" of the Defendant "were from 1998-2005." The State again replies that any discrepancies in the proof are within the province of the jury, and the Defendant, therefore, cannot prevail in his challenge to the sufficiency of the evidence in this regard.

The State relied on the evidence presented during the first phase of the trial to prove that the underlying offenses were criminal gang offenses as delineated by section 40-35-121(a)(3)(B)(xxv) (2014) (enumerating the commission or attempted commission of "possession of a controlled substance . . . with intent to sell, deliver, or manufacture, as defined in [section] 39-17-417(a)(4)" as a "criminal gang offense"). The evidence clearly established that the Defendant was guilty of attempted possession of 0.5 grams or more of cocaine with intent to sell and attempted possession of 0.5 grams or more of cocaine with intent to deliver, as recounted above, satisfying the statutory definition of a criminal gang offense.

The State also introduced ample evidence that the Defendant was a member of a criminal gang known as the Gangster Disciples. According to Ofc. Gilley, there was a "close association" between Gangster Disciples members in Jackson and Haywood County. Ofc. Gilley identified Terrell Lamont Reed, Byron Purdy, William Arnold, Tommy Champion, Michael Anthony Smith, and Marvin Sangster, as "documented members" of the Gangster Disciples from this area. Criminal gang offense convictions for Reed, Smith, and Champion were introduced into evidence.

20

Sgt. Williams testified that the principal activity of the Gangster Disciples was "narcotics dealing, specifically cocaine and heroin and marijuana[,]" but that their activities also involved "violent crimes, first degree murder, second degree murder, aggravated assault, simple assault, rape and various and sundry other crimes, weapons trafficking." The Defendant was found in possession of cocaine and various items during the July 10, 2014 search of his residence, which reflected an intent to attempt to sell or deliver. Moreover, Sgt. Williams said that he had seen the Defendant in the company of several documented Gangster Disciples members: Marvin Sangster, Randy Lanier, Randy Holloway, Jr., Melvin Taylor, Damont Shaw, and Tracy Taylor.

Furthermore, the jury concluded, based upon the following criteria, that the Defendant was a "criminal gang member": (1) the Defendant resided in or frequented a particular criminal gang's area, adopted their style or dress, their use of hand signs or their tattoos, and associated with known criminal gang members; and (2) the Defendant was identified as a criminal gang member by physical evidence such as photographs or other documentation. See Tenn. Code Ann. § 40-35-121(a)(2)(D) & (G). The Defendant's blue and white belt with the phrases "BLAC" and "DUES PAID" exhibited characteristic colors and expressions of the Gangster Disciples. The belt was found on the Defendant's dresser during the July 10, 2014 search. Sgt. Williams testified that most members did not hang on to gang paraphernalia, wear gang colors or belts, or continue to engage in criminal activity after leaving the gang. The Defendant also had a tattoo on his right shoulder, which exhibited Gangster Disciples emblems. In April 2013, just a little over a year prior to the search in this case, the Defendant resided in a neighborhood under the Gangster Disciples' control, and during an interview with Sgt. Williams, the Defendant took credit for the calm in the area, which indicated a position of "some rank" in the gang to Sgt. Williams. The Defendant had, also some years prior, admitted to Sgt. Williams that he was a Gangster Disciples member.

Ofc. Gilley said that gangs use social media as "recruitment tool[.]" Two videos from Facebook were played for the jury—one by Jeffrey Harris, a local rapper known as "Stack Plenty," that was filmed at a Jackson apartment complex, the gang's "home base"; and another "video involving a dispute between the Gangster Disciples and a rapper named Rick Ross[.]" Additionally, two photographs were retrieved from the Defendant's Facebook account—one depicting a professional basketball player with the Chicago Bulls displaying a Gangster Disciples hand sign and using their gang sayings and the other imparting "A Gangster's Prayer." The Defendant also demonstrated a gang hand sign for the jury.

Based upon the foregoing, we conclude that there was sufficient evidence for the jury to conclude that the Defendant was an active member of the Gangster Disciples. The jury was free to disregard his claim that he had retired from the gang. Accordingly, we conclude that the evidence sufficiently established violations of the gang enhancement statute. He is not entitled to relief on this issue.

21

*C. Constitutionality of the Statute*

The Defendant, citing <u>State v. Bonds</u>, 502 S.W.3d 118 (Tenn. Crim. App. 2016), <u>perm. app. denied</u> (Tenn. 2016), argues that Tennessee Code Annotated section 40-35-121 (2014)[5] is overbroad, and facially unconstitutional, because the statute requires no connection between the underlying crime and alleged gang membership in order for the enhancement to apply. The State responds by arguing that this issue is waived because the Defendant did not challenge the constitutionality of the statute at any time during the proceedings in the trial court.

The Defendant concedes that he did not raise the issue in the trial court and that the issue is reviewable on appeal only for plain error. The State cites to <u>State v. William Jermaine Stripling</u>, No. E2015-01554-CCA-R3-CD, 2016 WL 3462134, at *5 (Tenn. Crim. App. June 16, 2016), arguing that the <u>Stripling</u> court "suggest[s] that Stripling's failure to attack the constitutionality of Tenn[essee] Code Ann[otated] [section] 40-35-121 in a pretrial motion would have resulted in waiver had the State made waiver arguments on appeal." Accordingly, because the State is asserting waiver on appeal in this case, they maintain that we should not address the Defendant's claim. In <u>Stripling</u>, the defendant did not file a pre-trial motion challenging the constitutionality of the gang enhancement statute, but instead, he raised the issue for the first time at the sentencing hearing and later in his motion for new trial. 2016 WL 3462134, at *5. The panel first stated that usually the failure to raise a constitutional challenge to a statute in a pre-trial motion results in a waiver of the issue on appeal. <u>Id.</u> However, because the State did not raise the issue of waiver when the Defendant argued the constitutionality of the statute at the sentencing hearing or on appeal, the <u>Stripling</u> court addressed the merits of the Defendant's claim. <u>Id.</u> (citing <u>State v. Smith</u>, 48 S.W.3d 159, 162 n.1 (Tenn. Crim. App. 2000)).

We find nothing in this court's analysis in <u>Stripling</u> that obviates the "plain error" doctrine in its entirety. Our supreme court has held that "questions not raised in the trial court will not be entertained on appeal and this rule applies to an attempt to make a constitutional attack upon the validity of a statute for the first time on appeal unless the statute involved is so obviously unconstitutional on its face as to obviate the necessity for any discussion." <u>Lawrence v. Stanford</u>, 655 S.W.2d 927, 929 (Tenn. 1983) (citations omitted). The Tennessee Rules of Criminal Procedure were adopted and approved by the General Assembly in 1978, and the drafters of the rules provided for the recognition of "plain error" in criminal cases. <u>State v. Adkisson</u>, 899 S.W.2d 626, 637 (Tenn. Crim. App. 1994). Indeed, this is precisely the situation the plain error doctrine was designed to address. <u>See, e.g.</u>, <u>State v. Marvin Davis</u>, No. W2013-00656-CCA-R3-CD, 2014 WL 1775529, at *4-9 (Tenn. Crim. App. May 1, 2014) (analyzing a defendant's challenge to the constitutionality of Tennessee Code Annotated section 24-7-123, which provides for

---

[5] The statute has since been amended.

the admissibility of the video recording of a forensic interview of a child under the age of thirteen, utilizing the plain error doctrine).

The plain error doctrine states that, "[w]hen necessary to do substantial justice, an appellate court may consider an error that has affected the substantial rights of an accused at any time, even though the error was not raised in the motion for a new trial or assigned as error on appeal." Tenn. R. App. P. 36(b). In determining whether plain error review is appropriate, the following factors must be established:

> (a) the record . . . clearly establish[es] what occurred in the trial court;
> (b) a clear and unequivocal rule of law [has] been breached;
> (c) a substantial right of the accused [has] been adversely affected;
> (d) the accused did not waive the issue for tactical reasons; and
> (e) consideration of the error is "necessary to do substantial justice."

State v. Smith, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting State v. Adkisson, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). On appeal, the defendant has the burden of establishing that these five factors are met. State v. Gomez, 239 S.W.3d 733, 737 (Tenn. 2007) (citing State v. Bledsoe, 226 S.W.3d 349, 355 (Tenn. 2007)). The appellate court need not consider all five factors if any single factor indicates that relief is not warranted. Smith, 24 S.W.3d at 283.

The Defendant argues that the statute is unconstitutionally overbroad because it requires no nexus between the criminal activity and the Defendant's gang membership in order for the enhancement to apply. We have previously examined this argument in Bonds, 502 S.W.3d 118, and Stripling, 2016 WL 3462134. In Bonds, this court noted that the General Assembly clearly had the authority to enact laws proscribing the harmful effect of criminal gangs. 502 S.W.3d at 156. However, the court concluded that Tennessee Code Annotated section 40-35-121(b) was not reasonably related to that purpose and therefore did not satisfy the requirements of substantive due process. Id. at 156-57. In so concluding, the panel reasoned,

> It simply cannot be maintained that a statute ostensibly intended to deter gang-related criminal conduct through enhanced sentencing is reasonably related to that purpose where the statute in question is completely devoid of language requiring that the underlying offense be somehow gang-related before the sentencing enhancement is applied. Without a nexus requirement, [s]ection 40-35-121(b) directly advances only the objective of harsher treatment of criminal offenders who also happen to be members of a criminal gang. Because [s]ection 40-35-121(b) fails to even obtusely target gang-related criminal activity, it lacks a reasonable relationship to achieving the legitimate legislative purpose of deterring criminal gang activity and therefore violates the principles of substantive due process.

23

Id. at 157.

The Bonds court further determined that the statute violated substantive due process principles because it "imposes mandatory punishment on an eligible defendant by imputing to him responsibility for the criminal activity of the gang as a collective without requiring the defendant's knowledge of and intent to promote such activity." 502 S.W.3d at 158; see also Scales v. United States, 367 U.S. 203, 224-25 (1961) ("In our jurisprudence guilt is personal, and when the imposition of punishment on a status or on conduct can only be justified by reference to the relationship of that status or conduct to other concededly criminal activity . . . that relationship must be sufficiently substantial to satisfy the concept of personal guilt in order to withstand attack under the Due Process Clause."). The Stripling court agreed that Tennessee Code Annotated section 40-35-121(b) violates substantive due process principles. 2016 WL 3462134, at *7-8.

The State does not dispute these holdings on appeal but argues that no clear and unequivocal rule of law was breached at the time of the Defendant's sentencing in November 2015, noting that both Bonds and Stripling were not decided until 2016. The Defendant, relying on State v. Cecil, 409 S.W.3d 599 (Tenn. 2013), submits that the legal principles announced in Bonds and Stripling should apply to him because his case was in the "appellate pipeline" at the time these decisions were issued.

In Cecil, our supreme court held that the absence of the jury instruction required by State v. White, 362 S.W.3d 559 (Tenn. 2012),[6] when warranted, results in constitutional error. Cecil, 409 S.W.3d at 610 (citing State v. Faulkner, 154 S.W.3d 48, 60 (Tenn. 2005)) (noting that the failure to properly instruct the jury pursuant to White is a "failure to instruct the jury on a material element of an offense," resulting in constitutional error of due process dimensions). Moreover, the Cecil court made it clear that the requirement of a White jury instruction applied to cases then in the "appellate pipeline[,]" regardless of whether the issue was raised in the trial court. Cecil, 409 S.W.3d at 608 (citing Lease v. Tipton, 722 S.W.2d 379, 379 (Tenn. 1986) (per curiam) (adopting the "pipeline approach," which applies a new legal principle "to the litigants at bar, to all actions pending on the date the decision announcing the change becomes final[,] and to all causes of action arising thereafter")).

We agree with the Defendant that, pursuant to the "pipeline approach," the legal principles outlined in Bonds and Stripling are applicable to his convictions imposed pursuant Tennessee Code Annotated section 40-35-121. Moreover, if neither of these

---

[6] In State v. White, our supreme court held that the question of whether a kidnapping was "essentially incidental" to an accompanying offense is a question of fact for a properly instructed jury. 362 S.W.3d 559, 577 (Tenn. 2012). This finding by a jury, along with a reviewing court's "assess[ment] [of] the sufficiency of the convicting evidence," is sufficient to protect the defendant's due process rights. Id. at 577-78. To facilitate this determination, the White court delineated a specific jury instruction. Id. at 580-81 (footnote omitted).

cases existed, we fail to see how we would be constrained to uphold a statute that was "so obviously unconstitutional on its face as to obviate the necessity for any discussion." Lawrence, 655 S.W.2d at 929 (citations omitted); Davis, 2014 WL 1775529, at *4-9. As discussed above, the plain error doctrine provides this court with an avenue to grant relief in such a situation.

In accordance with Bonds and Stripling, without a requirement that the offense be related to the Defendant's criminal gang membership, we fail to comprehend how Tennessee Code Annotated section 40-35-121(b) is reasonably related to the goal of deterring criminal gang activity. The statute unconstitutionally abridges substantive due process, thus violating a clear and unequivocal rule of law. We are also convinced that all of the other factors for plain error relief are present—the record clearly establishes what occurred in the trial court; a substantial right of the Defendant has been adversely affected; the Defendant did not waive the issue for tactical reasons; and consideration of the error is necessary to do substantial justice. See Smith, 24 S.W.3d at 282. Accordingly, the Defendant's convictions for violating the gang enhancement statute in Counts 5 and 6 are reversed and dismissed.

*III. Sentencing*

On appeal, the Defendant argues that the trial court imposed an excessive sentence that was contrary to law. The State responds that the effective sixteen-year sentence imposed by the trial court was consistent with the purposes and principles of the Sentencing Act and that the Defendant has failed to overcome the presumption of reasonableness afforded that decision or show that the trial court abused its discretion.

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length and manner of service of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). Moreover, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2007). The party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

In accordance with the broad discretion now afforded a trial court's sentencing decision, "misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Bise, 380 S.W.3d at 706. This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." Id. at 709-10. Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1), a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3), and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). Carter, 254 S.W.3d at 344.

Furthermore, our supreme court has held that "the abuse of discretion standard, accompanied by a presumption of reasonableness, applies to consecutive sentencing determinations." State v. Pollard, 432 S.W.3d 851, 860 (Tenn. 2013). A trial court may order multiple offenses to be served consecutively if it finds by a preponderance of the evidence that a defendant fits into at least one of the seven categories in section 40-35-115(b). Tenn. Code Ann. § 40-35-115(b). This court must give "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated Section 40-35-115(b)." Pollard, 432 S.W.3d at 861. Moreover, "[a]ny one of these grounds is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735, 748 (Tenn. 2013)). "So long as a trial court properly articulates reasons for ordering consecutive sentences, thereby providing a basis for meaningful appellate review, the sentences will be presumed reasonable and, absent an abuse of discretion, upheld on appeal." Id. (citing Tenn. R. Crim. P. 32(c)(1); Bise, 380 S.W.3d at 705). When imposing consecutive sentences, the court must still consider the general sentencing principles that each sentence imposed shall be "justly deserved in relation to the seriousness of the offense," "no greater than that deserved for the offense committed," and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. §§ 40-35-102(1), -103(2), -103(4); State v. Imfeld, 70 S.W.3d 698, 708 (Tenn. 2002).

In asserting that his sixteen-year sentence is excessive, the Defendant does not contest the trial court's application of any one of the enhancement factors, and the record abundantly supports the application of the factors (1) and (8). Instead, in his minimal argument, the Defendant claims that the trial court "erred in sentencing him based on the mitigating factors submitted in this case" because both mitigating factors (1) and (9) should have been applied to him. However, we question whether use of mitigating factor (1) was appropriate here. There was testimony that the Defendant was involved in a criminal gang with its "predominant function" being narcotics trafficking and that a multitude of other criminal activities, some violent in nature, accompanied this

enterprise; thus, it is unlikely that the Defendant's criminal conduct neither caused nor threatened serious bodily injury, making mitigating factor (1) inapplicable under these facts. Conversely, we agree with the Defendant that the evidence supports application of mitigating factor (9) because he did provide assistance to the authorities in uncovering offenses committed by other persons. Inv. Greer testified at the sentencing hearing that the Defendant gave details in two other cases, which led to the seizure of drugs, vehicles, currency, and weapons. According to Inv. Greer, the Defendant placed himself in grave danger by furnishing this information. We make these notations for the trial court to consider upon resentencing. Because Tennessee Code Annotated section 40-35-121(b) violates substantive due process for lack of a nexus between the underlying offenses and the Defendant's gang affiliation, we reverse the judgments of the trial court in Counts 1 and 2 and vacate the enhanced sentences contained therein. The case is remand for modification of those judgments to Class C felonies and for a new sentencing hearing.[7] See, e.g., Stripling, 2016 WL 3462134, at *10; Bonds, 502 S.W.3d at 167 (both cases remanding for resentencing).

CONCLUSION

In accordance with the foregoing, we conclude that there was no error during the guilt phase of the trial on the Defendant's underlying convictions for attempted possession of 0.5 grams or more of cocaine with intent to sell and attempted possession of 0.5 grams or more of cocaine with intent to deliver. However, because Tennessee Code Annotated section 40-35-121(b) violates the Due Process Clause of the Fourteenth Amendment, the criminal gang enhancements in Counts 5 and 6 are vacated, and those judgments are reversed and dismissed. The judgments in Counts 1 and 2 are reversed and remanded for modification to reflect convictions for Class C felonies and to remove reference to the gang enhancement statute. The enhanced sentences in Counts 1 and 2 are vacated, and the case is remanded to the trial court for resentencing on those counts and judgment forms reflecting proper merger. The Defendant does not challenge his misdemeanor convictions or sentences in Counts 3 and 4, and those judgments are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[7] We also note that separate judgments were not entered in Counts 1 and 2 for attempted possession of 0.5 grams or more of cocaine with intent to sell and for attempted possession of 0.5 grams or more of cocaine with intent to deliver. Upon remand, after resentencing, the trial court shall enter separate judgment forms for these convictions in accordance with the Tennessee Supreme Court's recent decision in State v. Berry, 503 S.W.3d 360, 364-65 (Tenn. 2015).

27